## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-CR-185-JED |
| v. | ) | |
| | ) | |
| ELTON JOHN FERNANDES, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

### I.    Background

Defendant, Elton John Fernandes, is charged with knowingly and intentionally possessing, with intent to distribute, AB-FUBINACA (Count One) and XLR11 (Count Two), both of which are listed as Schedule I controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Those substances are also known as synthetic cannabinoids. Before the Court are defendant's two motions to suppress. Defendant requests that the Court enter an order suppressing evidence that was seized during a traffic stop (Doc. 17) and evidence thereafter seized from his residence (Doc. 16). The government responded (Doc. 21, 22). A hearing on the motions was held on February 10 and 11, 2016, and the following witnesses testified: Broken Arrow Police Detective Craig Brown; Broken Arrow Police Detective Michael Jackson; Sapulpa Police Officer Robert Glenn; the defendant's wife, Vallery Soares; Broken Arrow Traffic Officer John Daniels; and the defendant, Mr. Fernandes.

### II.    Suppression Proceedings

A motion to suppress is recognized and governed by Rule 12. *See* Fed. R. Crim. P. 12(b)(3)(C). Pursuant to Rule 12(d), "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." This Opinion and Order shall serve as

the Court's essential findings on defendant's motions to suppress.  The purpose of a suppression hearing is to "determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments." *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982).  When making a preliminary determination of the admissibility of evidence, "the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a); *see also Merritt*, 695 F.2d. at 1269-70.  Thus, "the law is clear that hearsay evidence is admissible at suppression hearings."  *United States v. Sanchez*, 555 F.3d 910, 922 (10th Cir. 2009) (citing *United States v. Miramonted*, 365 F.3d 902, 904 (10th Cir. 2004)).

## III.    The Suppression Hearing

As the suppression hearing unfolded over the course of two days, the credibility of certain law enforcement witnesses was called into serious question.  The events of the second day of the hearing were extraordinary: (1) The government reopened its evidentiary presentation in order to correct materially inaccurate testimony provided by its law enforcement witnesses the day before; and (2) the government had to acknowledge that the testimony of the first defense witness – which was diametrically opposed to the testimony of the government's law enforcement witnesses on day one – was, in fact, the truth.  The Court's view of the live testimony of all of the witnesses, and its perceptions of the credibility of each, has played a crucial role in the Court's essential findings of fact herein and, thus, the ultimate result.[1]

---

[1]    While the credibility of the government's witnesses was called into doubt, this Opinion and Order should not be construed as chastising the conduct of the Assistant United States Attorneys (AUSAs) involved in this matter.  Upon learning of the possible inaccuracy of their witnesses' in-court testimony during the first day of the hearing, the AUSAs conducted additional investigation.  At the outset of the second day of the hearing, they brought to light additional information in an attempt to correct the law enforcement testimony that the AUSAs had learned, after the fact, to be incorrect.  The AUSAs also offered witnesses in the event the Court wished to hear from them.

On day one of the suppression hearing, the government presented the testimony of Detectives Brown and Jackson of the Broken Arrow Police Department and Sapulpa Police Officer Glenn. All three officers are members of the Drug Enforcement Administration (DEA) Task Force. Their testimony was largely in lock step as to the October 7, 2014 initiation of a traffic stop of the defendant, the search of his vehicle, the execution of a search warrant upon his home, and the entry of law enforcement into the defendant's home after the warrant was signed. Detectives Brown and Jackson testified that they were aware of other officers' surveillance of the defendant's house the day before, on October 6, 2014, during which other officers had witnessed the defendant retrieve a box from his garage and load it into a newer model Chrysler 300 and then witnessed the defendant travel to four different convenience stores in the Tulsa area.

Brown and Jackson were not involved in the October 6 surveillance, although Jackson had been involved in previous surveillance relating to the defendant in 2013. Jackson testified that he could not recall any evidence of any drug distribution by defendant between June 2013 and October 6-7, 2014, and the Court was not presented any evidence that the officers believed that the events in 2013, standing alone, provided them cause to arrest the defendant or initiate a search of his car or residence in 2014 or, for that matter, back in 2013.

From the early morning hours of October 7, 2014, between 6 and 8 officers were involved in conducting surveillance of defendant's home.[2] Unlike the day before, Detectives Brown and Jackson were involved in the surveillance. They were aware that several convenience stores had been raided or were being raided that morning by other state and local

---

[2]     Not all officers who were present have been identified by name, but the testimony of officers generally identified between 6 and 8 officers present at the home throughout the entirety of the day. Brown testified that there were 7 or 8 officers who were involved in the surveillance in the morning and that 6 or 7 other officers, in addition to Brown and Glenn, were involved in the execution of the search warrant at the home.

law enforcement agencies, but the testifying officers were not involved in those raids, and the government did not present any evidence that any items seized in the convenience store raids were illegal or had any specific nexus to the defendant.  Brown testified that, from approximately 5 or 6 a.m. to about 11 a.m. on October 7, he was positioned approximately a quarter to a half mile away from defendant's home, at the intersection of Queens Street and Elm Place in Broken Arrow.  The officers knew, from prior police surveillance of defendant's home, that Brown's location would be directly in the path of the route that the defendant was known to take out of his neighborhood.

Detective Jackson notified Brown that the defendant was observed exiting through his garage with a white plastic bag, which he placed in his vehicle, and that defendant was headed eastbound toward Brown's location.  Brown testified that he observed defendant fail to signal a turn from Queens Street to Elm Place and thus Brown initiated a traffic stop.  Defendant pulled over and stopped his vehicle, and Brown then approached the driver's side window and asked defendant for his driver's license and insurance verification.  The defendant complied, and Brown asked him to exit the vehicle and join Brown at the rear of defendant's vehicle.

Jackson arrived one or two minutes after Brown stopped defendant's vehicle.  There were also two uniformed patrol officers who arrived at the scene of the traffic stop while Jackson, Brown, and the defendant were standing at the back of defendant's car.  Thus, during much of the stop, there were two unmarked and one marked police vehicles – all with flashing police lights – behind defendant's car where the defendant was standing by Jackson and Brown.  Brown described one of the two uniformed patrol officers as a rookie and his training officer, whom he did not identify by name, and they stood from 10 to 12 feet behind Jackson, Brown, and defendant.  The description of the patrol officers, one a rookie riding with another officer, is

4

consistent with the testimony of Broken Arrow Patrol Officer John Daniels.  While Brown testified that the patrol officers "happened to be in the area" and "just ... pulled over to watch," Daniels testified that he was originally asked to initiate a traffic stop of the defendant but, due to Daniels's location in the city and his proximity to where the undercover officers were, undercover officers initiated the stop.

Brown testified that, once at the back of defendant's vehicle, he informed defendant of the reason for the stop, failing to signal a turn, then returned defendant's license and insurance to him and asked defendant "if there was anything illegal in the car and would he consent to a search of his vehicle," to which defendant replied "there wasn't anything illegal and yes [Brown] could search his vehicle."  Those questions occurred "almost simultaneously" with the return of defendant's license and insurance verification.  Jackson provided similar testimony, stating that Brown and defendant were standing behind defendant's vehicle when Jackson arrived; that Brown asked if there was anything illegal in the vehicle and defendant said "no"; then defendant gave consent to the search of his vehicle.[3]  Officer Daniels testified that he was not close enough to hear any discussions between Jackson, Brown, and defendant.

Defendant testified that (1) he did *not* give consent to any search, and (2) Brown did not even ask for consent to search his vehicle.  According to defendant, he has a bachelor's degree in criminal justice and at no time did he provide or would he provide any consent.  He was adamant that the officers had manipulated their testimony and lied.

The issue of whether defendant consented to the search is critical, because the consent was the alleged basis for the search of the vehicle, the fruits and result of which were, in turn,

---

[3]     Brown testified that he did not inform the defendant he was free to go before he asked him whether there was anything illegal in his car and whether he could search the vehicle, and he did not Mirandize the defendant before asking those questions.

used to show probable cause for the search warrant for defendant's residence.   Brown unequivocally testified that, had the defendant said no to the search, Brown would have told him that he was free to leave, and no search would have been conducted.   Moreover, the testimony was clear that, prior to the search of the vehicle, the officers had merely witnessed the defendant exit his garage with a white grocery type bag and had not witnessed him place any particular illegal substance in the bag.

While Brown searched the vehicle, Jackson stood with defendant off the side of the road to watch the defendant during the search.   Under the front passenger seat, Brown found a white bag that contained approximately 100 foil packages that were labeled King Kong.   (*See* Plaintiff's Exhibit 1).   Brown placed the white bag on the trunk lid to defendant's car, then read Fernandes his *Miranda* rights.[4]   Jackson testified that, immediately after the white bag with King Kong packets was found, but before the defendant was read the *Miranda* warning, Jackson searched defendant and found $3000.00 in his pocket.   Brown returned to searching the defendant's car, while Jackson questioned defendant.   Jackson testified that defendant stated that he was "just a low level dealer of the synthetic cannabinoid," "was only selling that to support his family," and "was en route at that time to sell the contents of that bag."   Brown's continued search of the vehicle yielded a cell phone, which the officers seized.

Defendant was then released because, according to Brown and Jackson, they did not have a field test to confirm the presence of synthetic cannabinoids.   Importantly, Brown admitted that he was therefore unable to immediately identify the King Kong packages as containing a controlled substance, and he "didn't have probable cause to arrest" the defendant, so they "had to" let him go.

---

[4]         Brown testified that the white bag has since been destroyed.

Immediately after releasing defendant following the traffic stop, Brown, Daniels, and the rookie drove to defendant's home.  At some point between the traffic stop and 2:31 p.m. when the search warrant was signed by a Tulsa County Special Judge, Jackson drove to downtown Tulsa to present his search warrant affidavit and obtain a search warrant for the house.  Daniels testified that Jackson and Brown asked Daniels to follow them to defendant's residence.  As Daniels explained, his fellow officers needed a uniformed presence.

On the first day of the hearing, the government's witnesses were unshakable in their testimony that no law enforcement officer entered the residence until after the search warrant was signed at 2:31 p.m.  That testimony was central to the government's opposition to the motions to suppress.  For example, in opposition to defendant's suppression argument that officers entered the house immediately after the traffic stop and before the execution of the search warrant, the government asserted that "Officers arrived at the Fernandes home prior to obtaining a warrant, but did not enter the home and only watched the perimeter" and "approached the residence and knocked on the front door" only after they "received notice" that the warrant was signed.  (Doc. 21 at 5).  In addition, Brown testified that (1) *at no time* did *any* law enforcement officer enter the home prior to the execution of the search warrant, and (2) there was no "protective sweep" of the house before the search warrant was signed at 2:31 p.m.  Jackson likewise testified that to his knowledge nobody entered the house prior to Jackson's phone call informing Brown that the warrant was signed.  Officer Glenn's very brief testimony was presented for the sole purpose of establishing that no law enforcement entered the house until after they learned of the warrant's entry.  He testified that: Brown notified the surveillance team that the warrant had been signed and that the officers should "get . . . a game plan together" as to how to approach the house to execute the warrant; that they thereafter made a "soft entry";

and that no law enforcement officer entered defendant's home prior to the judge's signing of the warrant.[5]

The timing of the first knock and the "soft entry" is also a critical point in the Court's determination that the testimony of Brown – the government's key witness on all important factual issues relating to the suppression motions – was not credible.  Brown testified that *he* knocked on the door of the home to make law enforcement's "soft entry" by virtue of a "knock and talk" *only after the search warrant was signed*.  Brown testified that all of the 7 or 8 officers who later searched the residence waited outside defendant's home because they "were waiting for the search warrant to be signed."  According to Brown, only after he received the call from Jackson, "sometime after 2:31 p.m.," did anyone enter the home:

[Question]     At that point did you go and enter the house?

[Answer]     Yes - - not immediately but we all kind of got a game plan together and there shortly after we made contact, a soft entrance at the residence.

[Question] [C]an you describe the difference what a soft entrance is?

[Answer]   Essentially a knock and talk....  I knocked on a door and waited for the occupant inside the door to answer it.

[Question]  Who answered the door?

[Answer]  Mr. Fernandes's wife.

[Question]   Who else was inside that home at the time besides Mr. Fernandes's wife?

[Answer]  Their small child.

[Question]    At any time did you or anybody from law enforcement enter the home prior to the execution of the warrant by a judge?

---

[5]     Glenn was treated as a case agent who sat at government counsel's table and thus was not excluded from hearing the testimony of any witnesses, including the testimony of Detectives Brown and Jackson, which was presented before Glenn's.

[Answer]     No.

As it turns out, *all of the government witnesses' testimony that no one entered until after 2:31 p.m. was false*, which was pivotal to the Court's evaluation of the credibility of the government's witnesses, as well as to the determination of the issues presented herein.  It was not until defendant's wife, Vallery Soares, testified that the truth came to light.  Ms. Soares was subpoenaed by defendant, as she and defendant are somewhat estranged.  Her testimony was directly contrary to the testimony of the law enforcement witnesses.  She testified that her husband left the house sometime around 11:00 a.m. on October 7, 2014.  Not long after that, she received a call from defendant from an unfamiliar telephone number, and he told her that the police may be coming to the house. When she looked outside, she saw numerous cars parked around the street.  She had started cooking, so she went to the kitchen to check the stove.  At about the same instant, she heard a knock at the door, and her little boy informed her that the police were there.  She could see through some glass on the front door that at least one of the men at the door was in a black uniform, so she knew the police were at the door.

According to Ms. Soares, she opened the door and was asked whether there was a male member in the house, to which she replied, "my husband just left."  "More than five" law enforcement officers then entered the house.  Those officers include two who were in uniform, Detective Brown, and two other people.  They scattered and started looking around.  Ms. Soares reported to the officers that she had only recently come to the United States and she did not know the laws and asked "is it okay for you to be here?"  The officers answered "yes" and told her that they had just "met" her husband and "he knows we're coming here."  She asked to see a warrant and asked them for their papers, and the officers said the papers would come.  Ms. Soares asked the officers in her home to leave so that they would not scare her little boy, but officers told her

that "at least two people" would need to stay in the home with her.  Two uniformed officers stayed in the home with her, and another "kept coming and going," all day.  Ms. Soares believed that officers came in around 11:00 a.m. and remained until about 6:00 p.m., and she was at home with her son the entire time.  While officers were in the house, she did laundry, cooked, fed her son, had her lunch, and put her son down for a nap.  She remembered Brown, provided his name, and testified that he was in the house on the initial entry that morning, well before the search warrant was returned.

On the second day of the suppression hearing, Ms. Soares's testimony was largely proven to be accurate.  At the outset that morning, the government's counsel informed the Court that the government had conducted further investigation and learned that Officer Daniels and his trainee did, in fact, go in the home with an undercover officer *before* the execution of the search warrant, and they sat with defendant's wife and child on October 7, 2014.  The government offered either a stipulation to that effect or to present the testimony of Officer Daniels, and the Court requested to hear the testimony.

With respect to entry into the home, Daniels testified that he and his rookie trainee followed Brown to the defendant's house immediately after the traffic stop on October 7, 2014.  When they arrived at the home, they went inside the house.  Daniels indicated that he did not remember how many officers, but that Daniels and the rookie officer stood on the porch with a "couple of the undercover officers" who "knocked, made contact, and . . . went in."  The undercover officers scattered throughout the home and walked individually through all rooms, including the bedrooms, living room, and kitchen.  The undercover officers brought the wife and son to the living room, and "they were beginning a conversation and then [Daniels and the rookie] were asked to step outside for a moment so [they] went back outside."  Daniels did not

recall how long the undercover officers were in the home with the wife and son, but "after a little while," the undercover officers came back out and asked the uniformed officers to go back inside the house and sit with the wife and child.  Thereafter, Daniels and his trainee stayed in the house for "one to two hours" before the undercover officers "came back with a search warrant and executed the search warrant" while Daniels sat with the wife and son.

With respect to whether Ms. Soares consented to the officers' entry into the home, Daniels testified that he did not remember whether officers gave an order or whether Soares gave the officers consent to enter.  Consistent with Ms. Soares's testimony about the timing of their entry (well before 2:31 p.m.), Daniels testified that, when officers entered the home, she was in the process of making a meal, and Daniels did not eat lunch because he was in the house the entire time.  He further testified that, prior to entering the home, officers had observed no signs of danger, fire, or weapons in the house, and they heard no unusual noises, flushing, or screams.

Daniels also testified that he did not see Brown inside the house before other officers came back with the search warrant.  The Court finds that Daniels was generally a credible witness.  However, his denial that Brown was not one of the undercover officers who initially knocked on the door, made contact with Ms. Soares, and "went in" is in conflict with Brown's own testimony.  Brown testified that the officers' first entry into the home was by *Brown* knocking on the door, followed by a "soft entry" into the home, and that, at that time, the only people in the home were Ms. Soares and her son.  And, although Daniels was not present for the testimony of Brown, Jackson, and Glenn the first day, it was Brown who "reached out" directly to Daniels in between the first and second days of the suppression hearing, after the government's counsel inquired as to whether any officers had, in fact, entered the home before the search warrant was entered.

11

Following Daniels's testimony, the government recalled Brown to testify.  During his second trip to the stand, Brown reiterated that he had not been aware of a "protective sweep" happening before execution of the search warrant or of anyone entering the house prior to execution of the search warrant.  He purported to be "shocked" when he learned from Ms. Soares's testimony that there may have been a uniformed officer present in the house and so he "reach[ed] out to that uniformed officer."[6]

Brown's own testimony changed between the first and second days of the hearing.  For example, on day one, he did not report a lack of recall regarding the first law enforcement entry into the home on October 7, 2014.  Indeed, his testimony on day one – that no law enforcement entered the home prior to the execution of the search warrant – was absolutely clear and unequivocal.  Also, as noted, he testified that he was the one to first knock on the door ("I knocked on the door"), at which time the officers made their first entry – by "soft entrance" –and defendant's wife answered the door.  During cross-examination on the second day of testimony, when asked whether he entered the house prior to 2:31 p.m., he answered "to my knowledge, no," and he claimed not to recall whether he knocked on the door.  Although Brown maintained that he did not recall any officers entering the home prior to the execution of the search warrant, he admitted that he was within "eye shot of the front door" to the home.

Based on the demeanor and testimony of the live witnesses and the about face in the government's theory in opposition to the motion to suppress evidence from the house, the Court has serious doubts as to the credibility of much of the law enforcement testimony that was

---

[6]    Although the testimony of the government's witnesses was conflicting regarding whether "a uniformed officer," as opposed to two, were present, the Court credits Ms. Soares's testimony that there were "two" uniformed officers, as well as at least two undercover officers, in the home before the execution of the search warrant.  Daniels's testimony was consistent with Soares's on this point.

presented during the hearing. *One thing was clear from the testimony heard by the Court: law enforcement officers were hell-bent on getting into the defendant's home on October 7, 2014.* Among other things, the DEA Task Force strategically staged the outside area around the defendant's home with between *6 to 8* officers from the early morning hours of that day.  If only surveillance, or even a traffic stop and potential arrest, had been their goal, a handful of officers would have sufficed.

Moreover, when Brown made the immediate traffic stop and found exactly what officers hoped to find, they still did not believe they had probable cause to arrest defendant, because they did not have a field test for synthetic marijuana, but they used that same as-yet-untested evidence as probable cause to obtain a search warrant for the home.  Before they could obtain that warrant, Brown and others joined up with the rest of the surveillance team at the home and *immediately knocked and made entry into the home*.  They did not have probable cause to arrest the defendant; they did not have yet have a warrant; they did not witness any emergency or danger when they arrived at the home; and they heard no screams and saw no weapons; but they made immediate entry into the home.  And, before Ms. Soares testified, all law enforcement witnesses inaccurately and adamantly *denied* that entry.  When asked to leave until they had a warrant, they did not leave; instead, officers scattered throughout the home, looking through every room.  At some point, the uniformed officers were ordered outside while at least two undercover officers were alone in the home talking to Ms. Soares and her son.

There were at most 8 officers at the house on October 7, 2014, at least 4 or 5 of those 8 officers entered the home (leaving only 3 or 4 outside), and the porch and door to the home were visible from the street.  But Brown and Glenn testified, unequivocally, that no officer entered until some time after 2:31 p.m. when the search warrant was signed.  Jackson testified that

officers surveilling the house at the time defendant departed could see inside the garage, and Brown testified that the purpose of "perimeter staging" is to cover the residence in order to see any visitors arriving at the residence, so that officers can make contact with them before the visitors enter the house.  That testimony and photos of the home that were included with the search warrant affidavit further undermine the credibility of the officers who claimed to have been unaware of any pre-warrant entry into the home.  Had they been in a position that they could not see that entry into the home, the Court would expect that they would have so testified during the first day of the hearing.  Rather, they insisted that absolutely no law enforcement entry was made until after 2:31 p.m.

At the conclusion of the evidence, the government's counsel acknowledged the troubling nature of the facts that (1) officers had not informed the AUSAs of the entry, and (2) the pre-warrant entry and sweep was not recorded in any report.

The substantial credibility issues on the government's side of the case lead the Court to also question the veracity of the government's testimony that defendant consented to the search of his vehicle.  The government's position in opposition to the motion to suppress evidence from the car was that the traffic stop had turned consensual, and the Court also discredits that position in light of the foregoing.

IV.    **Analysis**

   A.    **Motion to Suppress Evidence Obtained During the Traffic Stop**

In his motion regarding the traffic stop, defendant first asserts that his Fourth Amendment rights were violated because the duration of the detention exceeded the permissible scope of the initial stop.  (Doc. 17 at 3).  The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants

shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

A traffic stop for a suspected violation of the law is a "seizure" "and therefore must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, __ U.S. __, __, 135 S. Ct. 530, 536 (2014). To justify such a seizure, "officers need only 'reasonable suspicion' – that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Id.* (quoting *Prado Navarette v. California*, 572 U.S. __, __, 134 S. Ct. 1683, 1687-88 (2014)). The Supreme Court has "repeatedly affirmed" that the "'ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Id.* (quoting *Riley v. California*, 573 U.S. __, __, 134 S. Ct. 2473, 2482 (2014)). A stop is justified at its inception "if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v.* Salas, 756 F.3d 1196, 1200-01 (10th Cir. 2014) (quoting *United States v. Ozbirn*, 189 F.3d 1194, 1197-98 (10th Cir. 1999)). "Whether reasonable suspicion exists is an objective inquiry determined by the totality of the circumstances, and an officer's subjective motivation for the stop [ordinarily] plays no role . . . ." *Id.* at 1201 (quotation omitted).

Although the Court has noted credibility concerns with respect to Brown, defendant did not dispute that he failed to signal a left turn. The Court therefore finds that the traffic stop was justified at its inception because there was probable cause to believe that a traffic violation had occurred. *See Okla. Stat.* tit. 47, § 309 (failing to signal before leaving a traffic lane is a violation of the law). However, defendant challenges the duration of the stop and asserts that it did not

turn into a consensual encounter.  With respect to the length and circumstances of detention, the

Tenth Circuit has explained:

> In addition to being justified at its inception, a lawful traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry* [*v. Ohio*, 392 U.S. 1, 20 (1968)]. That is, "[t]he investigative detention usually must last no longer than is necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." [*United States v.*] *Hunnicutt*, 135 F.3d [1345,] 1349 [(10th Cir. 1998)](internal quotation marks omitted). In accordance with these principles, we have held that a law enforcement officer conducting a traffic stop "may generally request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings as appropriate." *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir.2004).
>
> In addition, "an officer may ask questions, whether or not related to the purpose of a traffic stop, if they do not excessively prolong the stop." *United States v. Simpson,* 609 F.3d 1140, 1146 n. 1 (10th Cir. 2010). However, "[o]nce an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." *United States v. Villa,* 589 F.3d 1334, 1339 (10th Cir. 2009). Thus, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005).
>
> Nonetheless, a "traffic stop may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." [*United States v.*] *White,* 584 F.3d [935,] 949 [(10th Cir. 2009)] (internal quotation marks omitted). In addition, "further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." *Hunnicutt,* 135 F.3d at 1349.

*United States v. Kitchell*, 653 F.3d 1206, 1217-18 (10th Cir. 2011).

There was no evidence here that the traffic stop was expanded beyond its (alleged)

original purpose as a result of Brown acquiring any "particularized and objective basis for

suspecting [defendant] of criminal activity."  *See id.*  In fact, Brown testified that he would have

told defendant he was free to leave if defendant had not consented to the search of his vehicle

and that, even after finding a bag of King Kong packets, Brown did not have probable cause to arrest.

Central to whether a police encounter is a consensual one is "whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996) (citation omitted); *United States v. Little*, 60 F.3d 708, 711 (10th Cir. 1995)). The subjective intentions or state of mind of either the defendant or police are irrelevant to the analysis. *See United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996). In traffic stop cases, the Tenth Circuit has identified numerous other factors bearing on whether an encounter was consensual. Those factors include: "the threatening presence of several officers"; "the brandishing of a weapon by an officer"; "some physical touching by an officer"; "the use of aggressive language or tone of voice indicating that compliance with the officer's request is compulsory"; "the prolonged retention of a person's personal effects such as identification"; "the absence of other members of the public"; "the officer's failure to advise the defendant[s] that [they] are free to leave"; and "a request to accompany the officer to the station." *See id.*; *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (internal quotation marks and citations omitted).

The Court has considered those factors and concludes that, in light of the totality of the circumstances presented, the encounter had not turned consensual at the time Brown began questioning defendant. Brown admitted that he did not tell defendant that he was free to leave. Although Brown testified that his questioning of defendant commenced "almost simultaneously" with the return of defendant's license and insurance, defendant was still situated outside of his vehicle, flanked by Detectives Brown and Jackson who were standing within a few feet of him,

17

while two unmarked and one marked vehicle, all with police lights flashing, were parked

immediately behind defendant, and two additional officers, in uniform, stood 10 to 12 feet

behind where defendant was standing with Brown and Jackson.   While the Court heard no

evidence that the officers used any threatening or aggressive tone or brandished their weapons,

the Court concludes that the situation would have conveyed to a reasonable person that he was

*not* free to terminate the encounter.

Similar analysis guides the determination of whether a defendant's consent to a vehicle

search was voluntary:

> Whether Rosborough freely and voluntarily consented to the search of the vehicle
> is a question of fact based on the totality of the circumstances, which we review
> for clear error. *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998). We
> consider whether the officer's conduct constituted a coercive show of authority,
> such that a reasonable person would believe he was not free to "decline the
> officer's requests or otherwise terminate the encounter." *United States v. West*,
> 219 F.3d 1171, 1176 (10th Cir. 2000) (quotation omitted). Factors tending to
> show that consent was coerced include the presence of more than one officer, the
> display of weapons, physical touching, and use of an aggressive tone. *United
> States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991).

*United States v. Rosborough*, 366 F.3d 1145, 1149 (10th Cir. 2004).   The government bears the

burden of proof:

> When the government relies on a defendant's consent for the validity of a search,
> the government bears the burden of proving that defendant's consent was freely
> and voluntarily given, a determination we make by evaluating the totality of the
> circumstances. *United States v. McRae,* 81 F.3d 1528, 1536–37 (10th Cir. 1996).
> We have developed a two-step test for determining the voluntariness of a consent
> to search: the government must (1) "proffer clear and positive testimony that
> consent was unequivocal and specific and freely and intelligently given" and (2)
> "prove that this consent was given without implied or express duress or coercion."
> *McRae*, 81 F.3d at 1537 (quoting *United States v. Angulo–Fernandez,* 53 F.3d
> 1177, 1180 (10th Cir.1995)).

*Sanchez*, 89 F.3d at 718-19.

Based on the Court's reasoning as to the extension of the stop and whether it had turned

consensual, the Court concludes that the government did not satisfy its burden of proof that any

18

consent given by defendant was given without implied or express duress or coercion. In any event, as noted, defendant testified that he did not consent to the search of his vehicle, and the Court accepts that testimony in light of the inaccurate testimony of the government's witnesses.

The Court concludes that the defendant's motion to suppress evidence obtained from and during the traffic stop should be granted.

### B. Motion to Suppress Evidence from the Search of the House

Because the evidence acquired during the traffic stop will be suppressed, the Court also finds there was not probable cause to obtain a warrant for the search of the house. Without evidence obtained from the traffic stop, there was no probable cause for the warrant. The government agreed in its response briefing that "[t]he 2013 events are alone insufficient to obtain a warrant on October 7, 201[4] . . . ." (Doc. 21 at 5). In addition, no law enforcement officer testified that he considered the 2013 allegations sufficient to a finding of probable cause for the search warrant issued on October 7, 2014, about one year and four months after the most recent 2013 event recounted in the affidavit supporting the search warrant. Indeed, it was clear from the evidence that the 2013 allegations were known to law enforcement on October 7, 2014, but they did not believe that those allegations, standing apart from the evidence seized from the October 7 traffic stop, were sufficient to obtain a search warrant for the house. Instead, the DEA Task Force officers went to great lengths to stage the area for purposes of obtaining sufficient evidence to obtain the search warrant, either from their surveillance of the home or the traffic stop initiated immediately upon the defendant's exit from his neighborhood on October 7. Brown and Jackson testified that, even after that stop yielded the King Kong packets and an alleged confession, they had to release the defendant for lack of probable cause.

The government argues that, even assuming there was not probable cause to support the issuance of the warrant, the officers acted in good faith under *United States v. Leon*, 468 U.S. 897 (1984).  In *Leon*, the Supreme Court modified the exclusionary rule to provide that evidence seized pursuant to a warrant that is later found to be invalid may still be admissible if the executing officers acted in good faith and with reasonable reliance on the warrant.  468 U.S. at 913.  In *Leon*, the police had obtained a search warrant that was ultimately found to be unsupported by probable cause.  The Supreme Court held that the exclusionary rule did not apply because the officers in good faith did all they could to adhere to the Fourth Amendment's mandate.  *See id.* at 926.  "Of course, *Leon* . . . do[es] not mean that evidence obtained under an invalid warrant should never be suppressed."  *United States v. Corral-Corral*, 899 F.2d 927, 932 (10th Cir. 1990).

In determining whether officers acted in good faith, the courts determine whether the officers' actions in reliance on the warrant were objectively reasonable.  *Id.*  The government bears the burden of proof on that issue.  *Id.*;  *see also United States v. Vanness*, 342 F.3d 1093, 1099 (10th Cir. 2003).  Although the showing required of the government is not substantial, *see Vanness*, 342 F.3d at 1099, in light of all of the foregoing facts, the totality of the circumstances, and the incorrect testimony provided by the government's witnesses during the first day of the hearing, the Court finds that the government did not meet its burden to establish objective good faith.

In the absence of consent from an appropriate occupant, "police officers need either a warrant or probable cause plus exigent circumstances to make lawful entry into a home."  *See Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam).  Here, the evidence established that officers entered defendant's home before any warrant was executed, and without consent or

exigent circumstances.  No officer testified that Ms. Soares consented to their entry into the home, and Ms. Soares testified that she asked the officers to leave until they had a warrant, but they refused.  Officers testified that they did not enter the home before execution of the warrant, and the entry and initial sweep through the home was not listed on any report.  While it appears that no evidence was seized until after the search warrant was executed, the Court finds these facts to be critically relevant to the determination of whether the officers' actions with respect to the entry and subsequent search were in good faith, and concludes that the motion to suppress the evidence obtained from the residence should be granted.[7]

## V.    Conclusion

For the foregoing reasons, the defendant's motions to suppress (Doc. 16, 17) are **granted**.


IT SO ORDERED this 12th day of February, 2016.


JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE

---

[7]     The Court recognizes that the law is well-settled that officers' motives, alone, do not render "otherwise lawful conduct illegal or unconstitutional."  *See Whren v. United States*, 517 U.S. 806, 812-13 (1996) (quoting *Scott v. United States*, 436 U.S. 128, 136 (1978)).  Here, however, the evidence plainly established that law enforcement presented untruthful testimony regarding their conduct, which called into doubt the veracity of the government's entire testimonial presentation.